**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**Civil No. 15-2744 (JRT/DTS)**

4BRAVA, LLC,

                                        Plaintiff,

v.

DANIEL SACHS, DSC PRODUCTS, INC., and
DSC PRODUCTS HOLDING, LLC,

                                        Defendants.

*****************************************

**Civil No. 15-2743 (JRT/DTS)**

LEDUC GIFTS & SPECIALTY PRODUCTS,
LLC, *d/b/a* Signature USA,

                                        Plaintiff,                    **MEMORANDUM OPINION**
                                                                      **AND ORDER**
v.

DANIEL SACHS, DSC PRODUCTS, INC., DSC
PRODUCTS HOLDING, LLC,

                                        Defendants.


DSC PRODUCTS, INC.,

                                        Counter Claimant,

v.

LEDUC GIFTS & SPECIALTY PRODUCTS,
LLC, *d/b/a* Signature USA,

                                        Counter Defendant.


DSC PRODUCTS, INC.,

              Cross Claimant/Third Party Plaintiff,

v.

BRUCE LEDUC, JENNEA LEDUC, MARCI
LEDUC, and 4BRAVA, LLC,

              Cross Defendants/Third Party Defendants.

---

Adrianna Shannon, **SHANNON LAW, LLC**, 333 South Seventh Street, Suite 2830, Minneapolis, MN  55402, for 4Brava, LLC and LeDuc Gifts & Specialty Products, LLC.

Bonnie M. Smith, **SHANNON LAW, LLC**, 333 South Seventh Street, Suite 2830, Minneapolis, MN  55402, for 4Brava, LLC, LeDuc Gifts & Specialty Products, LLC, Bruce LeDuc, Jennea LeDuc, and Marci LeDuc.

Timothy J. O'Connor, **LIND JENSEN SULLIVAN & PETERSON, PA**, 901 Marquette Avenue South, Suite 1300, Minneapolis, MN  55402, for LeDuc Gifts & Specialty Products, LLC, Bruce LeDuc, Jennea LeDuc, and Marci LeDuc.

Troy J. Hutchinson, **ROCK HUTCHINSON, PLLP**, 1907 East Wayzata Boulevard, Suite 330, Wayzata, MN  55391, for Daniel Sachs, DSC Products, Inc., and DSC Products Holding, LLC.

These two related cases involve an abandoned business venture that sought to sell tumblers to Walmart and other large retailers under the name Three Two Eight, LLC ("Three Two Eight").  On one side of the deal were Daniel Sachs and his companies DSC Products, Inc. ("DSC Products") and DSC Products Holding, LLC (collectively, "Defendants").  On the other side were the LeDuc family, including Bruce,[1] his daughter Jennea, and his wife Marcellas (collectively "the LeDucs"), and their companies, LeDuc Gifts & Specialty Products, LLC ("Signature") and 4Brava, LLC ("4Brava") (collectively, "Plaintiffs").

Before the Court are six motions and objections to an order of the Magistrate Judge.  Plaintiffs seek affirmative summary judgment against Defendants in both cases.

---

[1] Because this case regards multiple members of the LeDuc family, the Court will refer to the LeDucs by their first names.

Plaintiffs and the LeDucs also seek dismissal of DSC Products' counterclaims, crossclaims, and third-party complaint claims.

For the reasons that follow, the Court will grant in part and deny in part 4Brava's motion for affirmative summary judgment and deny Signature's motion for affirmative summary judgment.   The Court will order the windup and termination of Three Two Eight.   The Court will grant the motion to dismiss settled claims and Signature's, 4Brava's, and the LeDucs' motions for summary judgment on Defendants' counterclaims, crossclaims, and third-party complaint claims.

## BACKGROUND

## I.   FACTUAL BACKGROUND

### A.   Initial Discussions

In early March 2014, Sachs contacted Bruce about supplying DSC Products with tumblers.   (Decl. of Troy J. Hutchinson, Ex. A ("Sachs Dep.") at 18:23-19:5, 69:19-70:14, Oct. 20, 2016, Docket No. 147;[2] Decl. of Adrianna Shannon ("Shannon Decl."), Ex. 2 ("B. LeDuc Decl.") ¶ 6, Aug. 15, 2016, Docket No. 118.)   Bruce, along with Marcellas and Jennea, were "governors/managers" of Signature who owned injection molds and had been "designing, manufacturing, and selling double-wall thermal tumblers to individuals and retail establishments since 2004."   (B. LeDuc Decl. ¶¶ 2, 4-5, 21; *see*

---

[2] Unless otherwise indicated, all citations to the docket will be to Case No. 15-2743.   The parties submit identical declarations in Case Nos. 15-2743 and 15-2744.

*also* Shannon Decl., Ex. 3 ("J. LeDuc Decl.") ¶ 4.) [3]   Sachs and DSC Products had a preexisting relationship with Walmart, and Sachs testified that he sought out Bruce because Sachs' prior manufacturer attempted to sell directly to Walmart.   (Decl. of Daniel Sachs ("Sachs Decl.") ¶¶ 2, 4, Oct. 19, 2016, Docket No. 145; Sachs Dep. at 70:9-14.)

On April 23, 2014, Signature sent Sachs a price list for some of its tumblers. (Sachs Dep. at 93:11-23; B. LeDuc Decl. ¶ 7; Shannon Decl., Ex. 4.)   In May 2014, Signature sent Sachs product samples, which Sachs used in sales presentations to Walmart.   (B. LeDuc Decl. ¶¶ 8; Sachs Dep. at 71:16-72:10.)   Bruce and Sachs met in person with a Walmart buyer, Jason Rogers, in August 2014.   (B. LeDuc Decl. ¶¶ 14-21; Sachs Dep. at 147:17-148:10.)   At that meeting, Sachs and Bruce pitched Rogers American Tumbler products and showed him Signature's catalog.   (Sachs Dep. at 148:12-149:3, 169:6-8; Shannon Decl., Ex. 5 ("Rogers Dep.") at 24:19-27:16.)

Around September 2014, Walmart committed to "ordering 24 items for 200 stores," which is referred to as "Flow 1."   (B. LeDuc Decl. ¶ 24; *see also* Rogers Dep. at 29:1-24, 120:2-17.)   Four of Signature's injection molds could fill the order, but needed some modifications to use the Tritan material that Walmart required.   (B. LeDuc Decl. ¶¶ 25-27; *see also* Rogers Dep. at 116:15-117:13; Shannon Decl., Ex. 50 (December 2014 email chain, including Sachs asking about the cost and time it would take "to convert the current super traveler into Tritan").)

---

[3] Exhibit 3 was initially omitted from the Shannon Declaration and can be found at Docket No. 157.

Bruce allegedly told Sachs that Sachs would "be responsible for paying half of the costs to modify Signature USA's molds" – estimated at "between $30,000 and $40,000" – because Signature did not want to "bear the risks on the [Walmart] orders alone." (B. LeDuc ¶ 28.)   In September 2014, Sachs emailed a manufacturer for estimates regarding his "friend Bruce LeDuc" who was "looking for a lid for his coffee mug." (Shannon Decl., Ex. 7.)

In September 2014, Sachs emailed Bruce and informed him that he submitted samples for a second, larger order with Walmart, referred to as "Flow 2."   (Shannon Decl., Ex. 9; B. LeDuc Decl. ¶¶ 36, 38-39.)   Bruce explained that Sachs said this additional order would not require delivery until later in the next year; however, Walmart agreed to a faster timeframe than anticipated, which required the parties to fill Flow 2 early in 2015 rather than later that year.  (B. LeDuc Decl. ¶¶ 38-39.)

### B.      Purchasing Molds

Bruce decided Signature would need to "have some new equipment built," including copying some of its existing molds, in order to meet the needs of the new order. (*Id.* ¶¶ 40-41.)   Bruce allegedly told Sachs that Signature was not interested in funding the new molds for the second order, but because Sachs had already committed, Signature agreed to "commission the design and build of the additional needed molds and equipment," if Sachs provided "copies of the purchase orders from [Walmart] and funds . . . in advance."   (*Id.* ¶ 43.)   Bruce stated, "Sachs agreed to assist with financing the design and build of the new molds and equipment needed to fill the [Walmart] orders, but

only if he would have a guarantee of receiving his money back upon completion of the Flow 2." (*Id.* ¶ 47; *see also* J. LeDuc ¶ 27 (stating that Sachs agreed to contribute to the molds, but that "he wanted at least some of his money back if Three Two Eight failed and the partnership was dissolved in less than three years").)

Sachs disputes the LeDucs' characterization of the purchase of the molds. Sachs testified that he initially intended to purchase the product from Signature; but, once it became apparent that Signature could not fulfill the Walmart orders with its existing molds, he testified that "Bruce and [Sachs] decided on a verbal agreement that [they] were going to . . . purchase tooling together, and [they] were going to start a business together that sold product to the mass retailers. And [they] agreed that [they] were going to split the tools," as well as the costs, profits, and losses. (Sachs Dep. at 72:13-74:4.) But, Sachs could not identify a particular date or a specific conversation in which they reached this agreement. (*Id.* at 74:5-10.) Sachs only stated that the verbal agreement occurred before the confirmation of Walmart's Flow 1 order, at some point between April 2014 and September 2014. (*Id.* at 109:17-110:24, 171:22-172:1.)

 Sachs also testified that either he purchased the molds to own himself or their partnership purchased the molds making him a co-owner. (*See, e.g., id.* at 125:7-15; Sachs Decl. ¶ 7-11.) However, Sachs thought that he would receive reimbursement for his financing of the molds if the partnership ended, and admitted that the parties never discussed Sachs keepings the molds if the partnership fell through, (*see* Sachs Dep. at 125:2-25), which does not necessarily conflict with the LeDucs' characterization of the arrangement – aside from whether Sachs was considered to have "purchased" or

"invested" in the tools.  Sachs also stated that Sachs and Bruce "agreed that [they] would invest in new tooling."  (*Id.* at 55:23-56:4.)  Sachs admitted no written contract exists stating Sachs would own the tools.  (*Id.* at 123:25-124:14.)  But Sachs testified to his belief that "purchasing," providing money for the molds, equated to "ownership."  (*Id.* at 74:12-78:15,124:18-19.)  Sachs specifically stated that "[i]f I purchase something with my money, then yes, I own – I have ownership in that."  (*Id.* at 78:14-15.)

The record evidence shows that Signature entered into agreements with Aroplax Corporation ("Aroplax") to create the additional molds.  (*See* Shannon Decl., Ex. 10; B. LeDuc Decl. ¶ 32.)  Signature corresponded directly with Aroplax in creating the molds.  (Shannon Decl., Ex. 11; B. LeDuc Decl. ¶ 56.)  Sachs was not directly involved in discussions with Aroplax about the molds.  (Shannon Decl., Ex. 11 (showing the LeDucs and Aroplax did not copy Sachs on emails about the mold designs); Sachs Dep. at 89:12-90:2 (Sachs acknowledging he did not have "a whole lot" of involvement in the design of the molds).)  Sachs recognized that "Signature, in Aroplax's eyes, was the owner of the tools, on paper" because "Signature gave Aroplax the purchase orders for the tools."  (Sachs Dep. at 208:8-14.)

### C.   Three Two Eight LLC

Sachs "broached the idea of a partnership between" DSC Products and Signature after they met with Rogers, but Bruce stated he "was not interested in exposing Signature USA to the risks required to sell to mass-market discount retailers like [Walmart]," and he did not want to "creat[e] a compet[i]tor of Signature USA."  (B. LeDuc Decl. ¶ 22.)

After confirming Flow 2, Sachs "rais[ed] the partnership idea again[,] suggesting that [Sachs and the LeDucs] split profits and losses on the [Walmart] transactions." (*Id.* ¶ 44.) According to Bruce, he responded that the LeDucs would only consider a partnership if it involved a "separate company which would be established to share both the costs and the profits equally." (*Id.* ¶ 45.)

In October 2014, Sachs flew to Minnesota to meet with Bruce and Jennea about forming a partnership. (Sachs Dep. at 202:15-19; B. LeDuc Decl. ¶ 48.) On November 13, 2014, Sachs stated that he formed DSC Products Holding to represent his part of the new partnership. (B. LeDuc Decl. ¶ 57; Shannon Decl., Ex. 12; J. LeDuc Decl. ¶ 11.) Sachs created this new company, rather than using DSC Products because he "wanted to have it separate from [his] everyday business that [he] still had at the time." (Sachs Dep. at 185:22-186:3.) On November 26, 2014, Jennea and Marcellas LeDuc formed 4Brava to represent "the LeDuc branch of the partnership." (B. LeDuc Decl. ¶ 59; J. LeDuc Decl. ¶ 11.)

According to Bruce and Jennea, Sachs gave Jennea permission to name and register their partnership as a Minnesota LLC, and Jennea did so, filing articles of incorporation and paying certain fees to register Three Two Eight on November 26, 2014. (B. LeDuc Decl. ¶¶ 57, 60; J. LeDuc Decl. ¶ 12.) The parties agreed to split costs and profits equally between 4Brava and DSC Products Holding. (Sachs Dep. at 33:21-34:25; B. LeDuc Decl. ¶ 50; J. LeDuc Decl. ¶ 6.) Bruce and Jennea stated that the parties agreed that the LeDucs would have majority control in decision-making, (B. LeDuc Decl. ¶ 51;

J. LeDuc Decl. ¶ 6), but Sachs testified that they "didn't get into much" with regard to decision-making, (Sachs Dep. at 203:21-204:4).

On December 4, 2014, Sachs emailed Signature the Walmart purchase order for Flow 1. (B. LeDuc Decl. ¶ 62; Shannon Decl., Ex. 13.) The purchase orders were in DSC Products' name, but Jennea and Bruce stated that Sachs assured them the orders would be transferred to Three Two Eight's name. (J. LeDuc Decl. ¶ 21; B. LeDuc Decl. ¶¶ 64, 69.)

At the same time, Bruce sent orders for the modified and new molds to Aroplax in December 2014 on Signature's account because Aroplax "would not agree to fill orders for Three Two Eight or for Sachs or his companies because they had not worked with them in the past." (B. LeDuc Decl. ¶¶ 75-76; *see also* J. LeDuc. Decl. ¶ 23.) Bruce told Sachs that Signature would allow this arrangement "only if the [Walmart] purchase orders were transferred to Three Two Eight's name" and payments from Walmart were "scheduled to be paid in a Three Two Eight bank account which both parties could access." (B. LeDuc Decl. ¶ 77.) Jennea stated that Signature agreed to act as guarantor for Three Two Eight's services with Aroplax "in exchange for Three Two Eight's agreement to purchase samples from Signature USA, to rent Signature USA's molding and equipment for production of Three Two Eight's tumblers, and to pay for[]the expenses incurred." (J. LeDuc Decl. ¶ 24.) According to Bruce, Sachs agreed to change the account name with Walmart. (B. LeDuc Decl. ¶ 77.)

On January 6, 2015, Sachs sent Bruce an email stating that he had received the purchase order for Flow 2 with Walmart. (*Id.* ¶ 79.) On the same date, Sachs told the

LeDucs to place orders in Signature's name for Three Two Eight for both Flow 1 and Flow 2 with Aroplax, and noted "[a]s soon as our new company is set up we can submit a change order to Aroplax from our new company." (Shannon Decl., Ex. 14; B. LeDuc Decl. ¶ 80.)

Bruce stated that on January 15, 2015, Jennea emailed Sachs a draft operating agreement for Three Two Eight and "a draft trademark assignment agreement," and stated "that [she] would be forwarding an agreement regarding use of molds." (B. LeDuc Decl. ¶ 82.) The parties held a conference call around February 10, 2015, in which the parties agreed once again to split profits and losses equally, and that Jennea, Bruce, and Sachs would each have an equal vote in decision-making. (*Id.* ¶¶ 85, 87-88.) According to Bruce, the parties also discussed a lease agreement for Three Two Eight's use of Signature's molds, under which Sachs would be reimbursed for three years, and after that time, Three Two Eight could continue to use the molds until operation ceased. (*Id.* ¶ 89.) Under that plan, "Signature USA would maintain ownership of the molds, insurance on the molds, and maintain the molds." (*Id.*) According to Bruce, Sachs agreed to the plan "as long as he was able to receive a return of funds toward the molds if Three Two Eight, LLC was no longer operating in less than three years." (*Id.*)

On February 12, 2015, Signature sent Sachs a draft lease agreement reflecting these terms, which Sachs forwarded to his attorney. (*Id.* ¶¶ 91-92; Shannon Decl., Ex. 15.) Sachs testified the parties did not use the word "lease" until Signature sent this email and that this email constituted the first time Signature asserted ownership over the molds. (Sachs Dep. at 51:14-53:6.) Sachs also forwarded the proposed agreement to his

wife, Celestina Sachs ("Celestina"), who was neither an owner in Three Two Eight nor privy to any discussions regarding the partnership. (Shannon Decl., Ex. 16 ("C. Sachs Dep.") at 7:14-24, 10:8-10, 12:4-6, 13:5-8.) Celestina read through the contract, and "two things really stuck out to" her; she was surprised by the decision-making provision, giving the LeDucs the majority in decision-making, and by the tool lease agreement because it was her "understanding that the tools were co-owned." (*Id.* at 13:9-14:13.) Celestina asked Sachs about ownership of the tools and Sachs told her, "Bruce told me not to worry. He only did that for tax reasons." (*Id.* at 15:3-8.) Celestina told Sachs not to sign the agreement. (*Id.* at 17:7-8.) Then, around February 13, 2015, Sachs and Celestina held a conference call with Bruce and Jennea, and Sachs "echo[ed]" Celestina's concerns regarding the lease. (*Id.* at 16:22-17:19; B. LeDuc Decl. ¶¶ 93-94.) In response, Bruce and Jennea made clear that they viewed the tools as Signature's property, and that ownership of the tools was not negotiable. (*See* C. Sachs Dep. at 17:20-18:4; B. LeDuc Decl. ¶¶ 94-95, 97.)

After this conversation, Sachs continued making payments on the molds, including one the same day. (B. LeDuc Decl. ¶ 98; Sachs Dep. at 216:10-13; *see also* Shannon Decl., Ex. 18.) Sachs testified that he "started looking at the books, and . . . realized that . . . [he] had put in 400,000-plus dollars," and that in moving forward without assurances that he would get the molds he "was taking a gamble." (Sachs Dep. at 193:11-194:6, 216:10-21.) However, the only documented payment in the record by that time was Sachs' initial contribution of $40,602.50 to the molds. (Shannon Decl., Ex. 17.)

Soon after the telephone conference, on February 23, 2015, Signature threatened to stop production until Sachs assured Signature that the Walmart orders and proceeds were in Three Two Eight's name and went directly into a Three Two Eight account. (B. LeDuc Decl. ¶¶ 100-01; J. LeDuc Decl. ¶ 32; *see also* Shannon Decl., Exs. 19-21.) For example, on February 23, 2015, the LeDucs' attorney emailed Sachs' attorney, and copied the parties, regarding the remaining disputes, stating:

> All of this is for nothing, however, if we cannot at a minimum have the Walmart POs assigned to Three Two Eight **today**, and have the Walmart funds placed in a Three Two Eight bank account.  If we do not have such an assignment agreement and evidence that Walmart has been directed to remit funds to Three Two Eight rather than to your client, my client will be forced to stop all manufacturing and production on the Walmart orders today . . . .

(Shannon Decl., Ex. 20.)  Bruce also emailed Jennea and Sachs later that day, asking for confirmation on the creation of a joint account and "that Walmart [would] be wiring their payments to the joint account for the two POs."  (*Id.*, Ex 21.)  Sachs responded a few hours later:

> Bruce, I do not know how long it will take for the paperwork to be submitted and all proper information [to] be setup at Walmart.  I called the accounting department there today and I was not able to get a hold of anyone.  I left messages and I will continue again tomorrow.  What I do know is that I promise that I will get this set up so that we all have security knowing that the money from [W]almart PO's will be funded into our new partnership.

(*Id.*)  Sachs sent a second email later that night suggesting that they use a different bank for the joint account, and asserting:

> Regarding Walmart, just so you know there are not two purchase orders for Walmart, there will be close to 100 P.O.'s on these two orders.  Like I mentioned earlier, I don't know at this point how to switch the remit to

> address.  I need to speak to someone who can walk me through the process.
> But I am working on it!  I don't know how long it will take but I will keep
> you updated the second I know.

(Shannon Decl., Ex. 22.)

Also on February 23, Sachs and Jennea corresponded by text message where Sachs said he "left a message for the accounting department and [he would] again continue to try until [he got] a hold of someone" to change the remittance for the Walmart payment, but that it was "a big corporate frustrating circle every time [he] need[ed] to change a major part of [his] supplier ID." (*Id.*, Ex. 23; J. LeDuc Decl. ¶ 43.) Sachs testified that he was referring to changing the bank where Walmart directed payment, rather than changing the supplier of record.  (Sachs Dep. at 233:20-234:16.) Sachs never intended or attempted to switch the purchase orders or supplier information from DSC Products to Three Two Eight with Walmart.  (*Id.* at 230:1-231:5.)  Sachs testified that it would have been "impossible for Walmart to issue a [purchase order] in the name of Three Two Eight" because the company was new and did not have a "Dun & Bradstreet number" or "credibility."[4]  (*Id.* at 226:3-23.)  Sachs testified that he told Bruce this fact, but could not think of when he did so.  (*Id.* at 226:3-227:5.)  Sachs also could not identify where he learned that Walmart would not do business with a company like Three Two Eight.  (*Id.* at 227:23-228:13.)

---

[4] Plaintiffs provide declarations from others disputing that Walmart would not have been able to switch the purchase order to Three Two Eight's name.  (*See* Rogers Dep. at 14:21-16:8; Shannon Decl., Ex. 53 ¶¶ 10-14; Shannon Decl., Ex. 54 ¶ 6.)

Sachs admitted that the only change he attempted to make was a March 26, 2015 request to route the Walmart payments directly into the Three Two Eight bank account. (*Id.* at 227:1-5; Shannon Decl., Ex. 29.)   On March 27, 2015, Sachs emailed Bruce and Jennea stating he "requested a bank change directly to our new account 328 LLC," after which "all money will go directly to this account."[5]   (Shannon Decl., Ex. 24; *see also* Sachs Dep. at 251:2-23.)   However, Walmart rejected Sachs' request because DSC Products was the supplier of record, (Sachs Dep. at 227:1-5, 231:12-19); therefore Walmart continued to deposit the payments into DSC Products' account, and Sachs transferred some of the funds into Three Two Eight's joint account himself, (*see* Shannon Decl., Exs. 43-44; J. LeDuc Decl. ¶ 72).

According to the LeDucs, Signature decided to move forward on the Walmart orders based on Sachs' representations and the fact that he continued to act as though the partnership would proceed. (B. LeDuc Decl. ¶¶ 107, 113; J. LeDuc Decl. ¶ 46.) Production started on the Walmart orders in early March 2015.  (Sachs Dep. at 216:2-6.) On March 17, 2015, Sachs entered into two contracts with Biscayne Sales and Marketing, Inc. ("Biscayne"), one for Biscayne to work for DSC Products with Walmart and Sam's Club, and one for Biscayne to represent Three Two Eight products in sales to Walmart. (Shannon Decl., Ex. 27; *id.*, Ex. 53 ¶ 4-6; *id.*, Ex. 54 ¶ 5; B. LeDuc Decl. ¶ 115.)

---

[5] On March 29, 2015, Sachs' bookkeeper, Deborah O'Leary, sent a profit and loss sheet for Three Two Eight regarding Flow 2.  (Shannon Decl., Ex. 25.)  In that email, O'Leary stated, "Dan I had to convert all the PO's to 328 into cases," (*id.*), which Bruce interpreted to mean that "all [Walmart] purchase orders had been changed to Three Two Eight, LLC's name," (B. LeDuc Decl. ¶ 119).  The meaning of O'Leary's statement is not entirely clear and could also refer to Three Two Eight's accounting records.

Bruce and Sachs also pursued sales with Menards on behalf of Three Two Eight. In April 2015, Bruce met Doug McCauley, a sales representative with Menards, to discuss Three Two Eight selling tumblers to Menards.  (B. LeDuc Decl. ¶ 121; *see also* Sachs Dep. at 267:6-24.)   According to Jennea, Menards agreed to purchase tumblers from Three Two Eight in late April 2015.  (J. LeDuc Decl. ¶ 52.)  On May 4, 2015, McCauley sent an email to Bruce and Sachs telling them to get the documents together for a purchase order from Menards, and Sachs responded "I am on it," copying Bruce. (Shannon Decl., Ex. 28.)   Jennea and Bruce stated that in May 2015, Sachs also sent Jennea an agreement for sales to Menards and Target, which Sachs had already signed, and Jennea signed and returned; however, no such agreement is provided in support. (B. LeDuc Decl. ¶ 116; J. LeDuc Decl. ¶¶ 53-54.)

According to Bruce, Sachs expressed uncertainty in a May 2015 call about whether Menards would agree to purchase from Three Two Eight.   (B. LeDuc Decl. ¶ 124.)   But then in a conference call with McCauley, Bruce learned Sachs had been talking to McCauley independently and that Sachs had already learned that Menards would issue a purchase order.  (*Id.*)  Sachs completed all of the Menards paperwork under the name DSC Products, rather than Three Two Eight.   (*Id.* ¶ 125; Shannon Decl., Exs. 30-31.)  Sachs stated the reason for using DSC Products' name was that Three Two Eight "had no history."  (Sachs Dep. at 264:13-25.)  On May 8, 2015, Sachs and Jennea posted two job openings with Three Two Eight, and Three Two Eight hired Sachs' bookkeeper, Deborah O'Leary, as Three Two Eight's bookkeeper.  (J. LeDuc Decl. ¶¶ 55-57.)

Signature and Three Two Eight completed the Walmart orders "as scheduled." (J. LeDuc Decl. ¶ 46.)  There is not clear evidence in the record regarding precisely when the parties completed the Walmart orders, but the record reflects an expected end date of May 8, 2015.  (*See* Shannon Decl., Ex. 51.)

### D.   Breakdown within Three Two Eight

Bruce stated that on May 14, 2015, Sachs informed Bruce and Jennea that Sachs wanted to dissolve the partnership.  (B. LeDuc Decl. ¶ 126.)  In a May 18, 2015 email, Sachs proposed dissolving Three Two Eight; under Sachs' proposal, the parties would split the Walmart revenue, DSC Products would take over the Menards order and any future Walmart orders, and the parties would split the tools.  (Shannon Decl., Ex. 33; B. LeDuc Decl. ¶ 128; J. LeDuc Decl. ¶ 69.)  In that same email, Sachs estimated that the partnership still owed Aroplax $736,000.00.  (Shannon Decl., Ex. 33.)

On May 20, 2015, Jennea emailed Sachs regarding the location of the Walmart deposits after she learned the payments to Three Two Eight's account did not come directly from Walmart.  (*Id.*, Ex. 38; B. LeDuc Decl. ¶ 131; J. LeDuc Decl. ¶¶ 75-77.)  According to Jennea, "Sachs responded by simply stating that [Walmart] sends checks to DSC [Products]."  (J. LeDuc Decl. ¶ 72.)  The next day, Jennea emailed Sachs stating that 4Brava would transfer money to Three Two Eight in order to pay Aroplax's outstanding bills, but only if Sachs put the Menards purchase order in Three Two Eight's name and provided 4Brava with a schedule of Walmart's expected payments to the Three Two Eight account.  (Shannon Decl., Ex. 36.)  Also, on May 27, 2015, Jennea emailed

Sachs a notice of special meeting to dissolve the partnership, but Sachs never responded. (*Id.*, Ex. 34; B. LeDuc Decl. ¶ 136; J. LeDuc Decl. ¶ 79.)  Around the same time, Sachs sought to fill the Menards order with Aroplax on his own. (Shannon Decl., Ex. 35; B. LeDuc Decl. ¶ 130; J. LeDuc Decl. ¶ 71.)  On May 28, 2015, Aroplax refused, stating that it recognized Signature as the owner of the molds and that it could not complete DSC Products' order without written approval from Signature.   (Shannon Decl., Ex. 55.) Sachs responded by claiming ownership of the molds and threatening that Signature would "be held responsible for any [lost] business opportunities."  (*Id.*)

On June 3, 2015, Jennea texted Sachs asking about the Walmart deposits and requesting that Sachs "return the money to Three [Two] Eight's bank account." (Shannon Decl., Ex. 39 at 94.)  Sachs responded that he would not return the money "until the tools are acknowledged as DSC['s]."  (*Id.*; J. LeDuc Decl. ¶ 87.)  On June 15, 2015, Jennea learned from an affiliate of Biscayne that Sachs completed a Menards contract under the name DSC Products, rather than Three Two Eight. (J. LeDuc Decl. ¶ 89.)  On June 24, 2015, Jennea emailed Sachs stating the molds could be used to fulfill new Three Two Eight obligations if:  third-party vendors, including Aroplax, were paid in full on behalf of Three Two Eight for all prior orders; third-party vendors, including Aroplax, were paid in advance for the future order; and Three Two Eight paid Signature for the use of the molds.  (Shannon Decl., Ex. 41; Sachs Dep. at 265:12-266:8.)  Sachs did not respond to the email.  (Sachs Dep. at 266:4-8.)  Sachs eventually commissioned several of his own molds from Aroplax.  (*See id.* at 139:1-147:1; B. LeDuc Decl. ¶ 138.)

### E.     The Parties' Financials

Sachs estimated DSC Products received $1.5 million from Walmart, but acknowledged that Walmart records showing $1.7 or 1.8 million were likely accurate. (Sachs Dep. at 252:23-253:19; *see also* Shannon Decl., Ex. 56 at 1.)  Three Two Eight had $672,782.68 in outstanding debts on May 27, 2015, (Shannon Decl., Ex. 56 at 13), and Plaintiffs state that Three Two Eight incurred an additional $96,847.15 in interest, costs, and penalties.

Aroplax stopped or threatened to stop production on Signature's orders along with Three Two Eight's orders until they received payment.  (J. LeDuc Decl. ¶ 92; B. LeDuc Decl. ¶ 139.)  In order to satisfy Three Two Eight's obligations, 4Brava and Three Two Eight had to pay third-party vendors and creditors without any of the Walmart income. (B. LeDuc Decl. ¶ 140; J. LeDuc Decl. ¶ 91.)  4Brava contributed $535,003.12, which Three Two Eight paid to outside vendors, and Three Two Eight "borrowed" $206,552.68 from Signature to pay third parties.  (Shannon Decl., Ex. 56 at 14.)  Sachs admitted that either 4Brava or Signature paid Aroplax $630,000.00, following the breakdown of the partnership.  (Sachs Dep. at 258:7-18.)  Sachs valued the disputed tools at $395,000.00. (*Id.* at 257:6-7.)  Sachs conceded he has received more than the amount of money he invested in the molds from the Walmart revenue.  (*Id.* at 217:6-11.)

### F.     Sachs' Other Litigation

Plaintiffs note that another manufacturer, Williams Industries, Inc. ("Williams"), filed a counterclaim against DSC Products in the Southern District of California.  There,

Williams alleged that DSC Products failed to pay for Williams' manufacturing of tumblers for Walmart.   (*See* Shannon Decl., Ex. 60.)   According to the Williams' president, DSC Products entered into an agreement that Williams would be the sole manufacturer for Walmart's orders of tumblers through DSC Products.  (*Id.*, Ex. 61 ¶ 7.) DSC Products placed orders with Williams in January 2014, and Williams delivered tumblers to Walmart and invoiced them to DSC Products between April and June 2014, (*id.* ¶¶ 9-10, 12-13), which was the same time Sachs and Bruce discussed forming a joint venture, (*see* B. LeDuc Decl. ¶¶ 6-11).   Sachs then refused to pay Williams for the products, leaving, according to Williams, more than $1.4 million in unpaid invoices. (Shannon Decl., Ex. 61 ¶¶ 13-17.)  Williams contended that Sachs never objected to their arrangement, and that "[i]t was only when DSC[ Products'] payments for the Walmart orders became due, and Williams began pursuing DSC [Products] for the over $1.4 million owed to Williams, that Mr. Sachs began alleging 'fraud' and refusing to pay its outstanding obligations."  (*Id.*, Ex. 62 ¶ 13.)

### G.     Relationship Between Defendants

Sachs testified his monetary contribution to the molds came from DSC Products. (Sachs Dep. at 195:5-11.)  When asked whether the money came from DSC Products Holding, Sachs said "[i]t's possible that [he] moved money from DSC Products, Inc. to DSC Products Holding for some of it, but the reality is . . . the money came from DSC [Products], from Dan Sachs personally and through [his] business."  (*Id.* at 195:12-17.) Sachs further specified that the funds "came out of DSC Products' business account," and

when asked if that meant the money came "from Dan Sachs personally or DSC Products, Inc. or DSC [Products] Holding, LLC," he responded, "[i]t doesn't really matter where it came from.  It came from DSC Products."  (*Id.* at 195:22-196:6.)

O'Leary did not set up separate accounting records for DSC Products Holding, "because DSC [Products] Holding[] really had no activity."  (Shannon Decl., Ex. 32 ("O'Leary Dep.") at 13:8-12, 14:5-7; Sachs Dep. at 186:7-17.)  O'Leary also did not keep a separate ledger for Three Two Eight.  (O'Leary Dep. at 13:16-14:4.)  O'Leary acknowledged that she combined the accounts because "all of the bills and the product [were] under Three Two Eight. . . . [b]ut all of the invoices and revenue were under DSC Products, Inc."  (*Id.* at 53:18-25.)  O'Leary agreed that "you can't do business like that." (*Id.* at 54:5-6; *see also id.* at 16:2-4 ("I started realizing that I can't have the inventory in one company and the invoicing in another company.").)

DSC Products' accounting records also included some of Sachs' personal expenses, including more than $300,000.00 for settlement of a lawsuit brought against Sachs personally.  (*Id.* at 32:21-33:13; Shannon Decl., Ex. 44 at 2.)  Finally, Sachs took $513,644.00 in distributions from DSC Products' account during 2015.  (O'Leary Dep. at 38:3-14; Shannon Decl., Ex. 44 at 2.)

### H.    Sachs' Declaration

In response to the present motions, Defendants rely almost solely on a declaration from Sachs dated October 19, 2016 – the day of Defendants' responses in opposition to the present motions.  (*See generally* Sachs Decl. ¶¶ 1-30.)  Plaintiffs contend that the

Court should disregard Sachs' declaration as a sham declaration created to fabricate a fact dispute.  The Eighth Circuit has "held that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995).  If an affidavit intended to prevent summary judgment conflicts with prior testimony from the affiant, it "will preclude summary judgment only if the prior testimony reflects confusion on the part of the witness and the affidavits explain why the earlier testimony is in conflict with the affidavits."  *Id.* (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir. 1983)).  *RSBI Aerospace* involved clear conflicting testimony:  the new affidavits stated the plaintiff was not an employee on a certain date, when the same witnesses previously affirmed his employment status.  *Id.*

Here, Plaintiffs rely on a series of alleged contradictions that are not as stark.  Generally, Sachs' deposition reflects uncertainty over the ownership of the molds and the details of the Three Two Eight partnership, and portions of Sachs' declaration reflect more certainty in a contradictory manner.  Thus, while the Court will not entirely disregard Sachs' declaration as a "sham," the Court will look to all the evidence presented when determining if **genuine** issues of material fact remain.  In particular, there are several statements in the declaration that significantly conflict with the evidence or prior testimony; these parts of the declaration are, at best, misleading or exaggerated.

For example, in his declaration, Sachs stated that he "never agreed to be an officer, director or manager of Three Two Eight," and that neither he, DSC Products, nor DSC Products Holding "agreed to be a member of Three Two Eight."  (Sachs Decl. ¶ 20.)  But,

there is evidence that Sachs signed several contracts on behalf of Three Two Eight, and Sachs admitted that he attempted to switch the DSC Products bank information with Walmart to a Three Two Eight bank account. (*See, e.g.*, Shannon Decl., Ex. 27; Sachs Dep. at 36:7-15, 242:11-24.)

Sachs also declared that: "At no point did I ever agree that 4Brava, LLC, the LeDucs or Three Two Eight, LLC would have a right to share in the revenue or profits of any sales made by DSC Products, Inc. or DSC Products Holding, LLC." (Sachs Decl. ¶ 25.) While this may generally be true of other contracts or business dealings of the companies, there is clear evidence that Sachs agreed to direct revenues from the Walmart orders to Three Two Eight or 4Brava. For example, in an email dated February 23, 2015 Sachs said "[w]hat I do know is that I promise that I will get this set up so that we all have security knowing that the money from [W]almart PO's will be funded into our new partnership." (Shannon Decl., Ex. 21.)

Finally, Sachs stated that he, "through DSC [Products], funded the cost of the product [he] sold to [Walmart]." (Sachs Decl. ¶ 16.) However, Sachs previously admitted that there were outstanding debts to Aroplax in early June 2015, which the Signature or 4Brava paid. (Sachs Dep. at 59:25-62:10.) Three Two Eight's general ledger suggests that on May 27, 2015, the partnership owed over $672,000.00, at least most of it to Aroplax, which Signature and 4Brava paid over the next few months. (*See* Shannon Decl., Ex. 56 at 13.)

## II.     PROCEDURAL BACKGROUND

Plaintiffs filed both actions in Minnesota state court, and Sachs removed to federal court in June 2015.  (*See* Notice of Removal, June 17, 2015, Docket No. 1; Notice of Removal, June 17, 2015, Case No. 15-2744, Docket No. 1.)  In Case No. 15-2744, 4Brava brought claims against Sachs, DSC Products, and DSC Products Holding.  In Case No. 15-2743, Signature brought claims against Sachs, DSC Products, and DSC Products Holding.  DSC Products then brought counterclaims against Signature and filed Crossclaims and a Third Party Complaint against the LeDucs and 4Brava.

There are currently seven matters before the Court.  First, 4Brava and Signature object to the Magistrate Judge's September 30, 2016 order granting in part Defendants' motion to extend the time to take discovery in both cases.  Second, the parties filed six separate motions regarding the pending claims:   (1) 4Brava moves for affirmative summary judgment against Defendants; (2) Signature moves for affirmative summary judgment against Defendants; (3) Signature and the LeDucs move to dismiss the counterclaims subject to a settlement agreement with Defendants; (4) Signature moves for summary judgment on the counterclaims that were not subject to the settlement agreement; (5) the LeDucs move for summary judgment on the remaining crossclaims and third-party complaint claims not subject to the settlement agreement; and (6) 4Brava moves to dismiss all crossclaims and third-party complaint claims.

## ANALYSIS

I.  **OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER** (Case No. 15-2743, Docket No. 138; Case No. 15-2744, Docket No. 119)

As a preliminary matter, the Court considers Signature and 4Brava's objections to the Magistrate Judge's September 30, 2016 Order granting in part Defendants' motion for an extension of time to complete discovery.  The Court will reverse such an order only if it "is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a); D. Minn. LR 72.2(a)(3).

Defendants filed a motion to modify the scheduling order more than ten days after the present dispositive motions were filed, which was also the final day for filing such motions under the scheduling order.  (*See* Defs.' Mot. to Modify Pretrial Scheduling Order, Aug. 26, 2016, Docket No. 124; Pretrial Scheduling Order, Feb. 25, 2016, Docket No. 41 (setting deadline for dispositive motions for August 15, 2016).)  Defendants sought to extend the scheduling deadlines to allow them to depose the LeDucs.  4Brava, Signature, and the LeDucs opposed the motion, and submitted correspondence showing their attempts to provide Sachs opportunities to depose the LeDucs prior to the close of discovery.  (*See* Decl. of Adrianna Shannon in Opp'n to Mot. for an Extension, Sept. 2, 2016, Docket No. 132.)

On September 30, 2016, United States Magistrate Judge Steven E. Rau granted in part and denied in part Defendants' motion.  (Order at 1, Sept. 30, 2016, Docket No. 137)  The Magistrate Judge ordered that Defendants depose the LeDucs on or before October 12, 2016.  (*Id.* at 2-3.)  The Magistrate Judge explicitly found no good cause for

the motion, stating that Defendants did not act with due diligence and Defendants'
actions resulted in prejudice to the other parties. (*Id.* at 4.) Nevertheless, the Magistrate
Judge "grant[ed] their request to amend the Scheduling Order . . . to produce a complete
record of the facts so that the case [could] be decided on the merits." (*Id.*)

On October 11, 2016, Plaintiffs objected to the Order, arguing that the Magistrate
Judge erred by modifying the scheduling order while also finding no good cause and
without an affidavit pursuant to Fed. R. Civ. P. 56(d). Defendants responded to the
objections on October 19, 2016, arguing the LeDucs failed to show up for noticed
depositions pursuant to the Magistrate Judge's order and that the lack of depositions
prejudiced Defendants. (Defs.' Mem. in Opp'n to the Appeal/Obj. of Magistrate Judge
Decision, Oct. 19, 2016, Docket No. 146.) However, Defendants ended their opposition
stating:

> At this point, Defendants believe that the Court can dispose [of] the
> pending motions for summary judgment on the Record before the
> Court. . . . If, however, the Court believes that there are open factual issues
> from which the Court could benefit from having a complete Record,
> including the LeDucs' deposition testimony, Defendants would conduct the
> depositions and supplement the Record accordingly.

(*Id.* at 4.) On the same day, Defendants also filed memoranda in opposition to all of the
pending dispositive motions, even though, under the Magistrate Judge's order,
Defendants could have waited until after completing the disputed depositions. (*See* Order
at 3 (allowing Defendants to submit their opposition to the motions for summary
judgment within one week after the last deposition).)

The Court finds Defendants conceded the opportunity to enforce the Magistrate Judge's order.   If in fact Defendants thought that the depositions were necessary to oppose the dispositive motions, Defendants could have sought expedited consideration of the objections to the Magistrate Judge's order, and delayed responding to the pending dispositive motions, until the Court decided whether to enforce the Magistrate Judge's order.   As it is, enforcing the Magistrate Judge's order would require redoing the substantive briefing, which is now complete, and would be highly inefficient.   Therefore, the Court will sustain the objections and rule on the dispositive motions because Defendants failed to show good cause and essentially admitted the depositions are unnecessary to their opposition.[6]

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

In Parts III-IV and VI-VII of this order, the Court will consider motions for summary judgment.   Summary judgment is appropriate where there are "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   A

---

[6] The Court also reviewed the record evidence submitted with the objections and agrees that Defendants failed to show good cause to allow the extension.   It is clear from the correspondence that Defendants' counsel had multiple opportunities to reach an agreement on dates to depose the LeDucs, and Defendants made the unjustified decision to wait until the close of discovery and after the LeDucs filed dispositive motions.  (*See* Decl. of Adrianna Shannon in Opp'n to Mot. for an Extension, Exs. 1-32.)

court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). "When the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

## III.   4BRAVA'S MOTION FOR AFFIRMATIVE SUMMARY JUDGMENT
(Case No. 15-2744, Docket No. 102)

4Brava asserts the Court should hold Defendants jointly and severally liable with regard to all its claims. 4Brava further seeks affirmative summary judgment against Defendants on several of its claims: (1) fraud, (2) breach of fiduciary duties, (3) unlawful distributions, (4) civil theft, and (5) unjust enrichment. 4Brava also asks the Court to dissolve, wind up, and terminate Three Two Eight.

### A.   Joint and Several Liability

First, 4Brava argues Defendants should be held jointly and severally liable with regard to any of its claims because DSC Products and DSC Products Holding are Sachs' alter ego. To determine whether an entity is an alter ego under Minnesota law, the Court must "(1) analyz[e] the reality of how the corporation functioned and the defendant's relationship to that operation, and (2) find[] injustice or fundamental unfairness." *Ness v. Gurstel Chargo, P.A.*, 933 F. Supp. 2d 1156, 1166 (D. Minn. 2013) (quoting *Minn.*

*Power v. Armco, Inc.*, 937 F.2d 1363, 1367 (8th Cir. 1991)).  In considering the relationship between the shareholder and corporation, courts consider the following factors:

> insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

*Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979).  To satisfy the second prong, courts consider "evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner."  *White v. Jorgenson*, 322 N.W.2d 607, 608 (Minn. 1982) (quoting *W. Concord Conservation Club v. Chilson*, 306 N.W.2d 893, 898 n.3 (Minn. 1981)).

Plaintiffs provided significant evidence that Defendants disregarded corporate formalities and, in fact, operated as one.  Sachs testified in his deposition that whether money came "from Dan Sachs personally or DSC Products, Inc. or DSC [Products] Holding, LLC . . . [i]t doesn't really matter . . . It came from DSC Products."  (Sachs Dep. at 195:22-196:6.)  Further, the accounting records show DSC Products Holding did not have separate accounting books from DSC Products.  And, DSC Products' accounting records include some of Sachs' personal expenses, including more than $300,000.00 settlement from a lawsuit brought against him personally, and show that Sachs took $513,644.00 out of DSC Products.

Sachs argues briefly that Plaintiffs cannot meet the second prong because they have not shown that Sachs used control over his entities to perpetrate a fraud or injustice. *See A.P.I, Inc. Asbestos Settlement Tr. v. Home Ins. Co.*, 877 F. Supp. 2d 709, 732 (D. Minn. 2012) (finding no alter ego liability where there was no evidence that the party "abused the corporate form to perpetrate an injustice or that failure to pierce the veil would result in the kind of unfairness that the law requires"). However, for the reasons set forth in detail below, Plaintiffs have shown Sachs used his companies in his breach of fiduciary duties. Primarily, Sachs used DSC Products and DSC Products Holding to withhold funds from Three Two Eight. Thus, the Court finds Sachs involved his corporate entities in his wrongful conduct and the equities favor treating Defendants as one entity.[7] Overall, because Plaintiffs have provided significant facts showing Defendants were not separate entities and were used in an unjust manner, the Court will recognize them as alter egos and hold them jointly and severally liable with regard to the claims that follow.

### B.    Fraud

4Brava seeks affirmative summary judgment on its fraud claim. Under Minnesota law, a fraud claim requires a showing that:

---

[7] Sachs also notes that Plaintiffs make the opposite argument with regard to 4Brava, Signature, and the LeDucs, and argues that Plaintiffs "cannot have it both ways." (Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Summ. J. at 11, Oct. 19, 2016, Case No. 15-2744, Docket No. 121.) Of course, this argument is flawed, considering alter ego liability involves factual determinations and Sachs has not provided similar evidence regarding the relationship between 4Brava, Signature, and the LeDucs – particularly regarding their finances.

(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance.

*Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1071 (D. Minn. 2013) (quoting *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)).

4Brava argues that Sachs lied about switching the Walmart orders and payment information so that 4Brava would stay in business with him long enough to complete the Walmart orders, the proceeds of which DSC Products then withheld from Three Two Eight and 4Brava.  Specifically, 4Brava relies on Sachs' representations that he would ensure Three Two Eight was listed as the seller on the Walmart orders, that the Walmart orders revenue would be deposited directly into Three Two Eight's account, and that he would add Jennea as a signor to the account where the Walmart orders revenue was deposited.

Defendants argue that these representations are not actionable fraud because they were all statements of future performance.  Defendants are correct that a claim for fraud does not arise based on a statement of future action or opinions "simply because the event does not occur."  *Id.* at 1072.  But, a fraud claim can arise from such a statement "where there is evidence that the speaker had no intent to perform at the time the statement was made and made the statement to accomplish the fraud."  *H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1422 (D. Minn. 1993); *see also Richfield Bank & Tr. Co. v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1976) ("One who speaks must say

enough to prevent his words from misleading the other party." (quoting *Klein v. First Edina Bank*, 196 N.W.2d 619, 622 (1972))); *Vandeputte v. Soderholm*, 216 N.W.2d 144, 147 (Minn. 1974) ("It is true that a misrepresentation of a present intention could amount to fraud.  However, it must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made.").[8]  Thus, 4Brava can proceed to the next prong if it can show that Sachs made a statement of future performance with a present intent not to perform.

With regard to the first statement – that Sachs would switch the Walmart purchase orders and supplier information to Three Two Eight – there is clear evidence that Sachs did not intend to perform.  Sachs himself admitted that he never intended to do so.  But the record does not contain decisive evidence that Sachs made such a promise.  Based on the record before the Court, Sachs never specifically said that he would switch the supplier information in any of the contemporaneous record evidence.

There is some evidence supporting the fact that such a promise was made, or at least that Sachs led 4Brava to believe that he would put the Walmart orders in Three Two Eight's name; for example, Jennea stated in her declaration that Sachs made this promise. The LeDucs' attorney clearly stated production on the tumblers would cease unless Sachs

---

[8] This exception is recognized in several cases Defendants cite.  *See Iten Leasing Co. v. Burroughs Corp.*, 684 F.2d 573, 575 (8th Cir. 1982) (noting that the court found "no evidence that [the defendant] did not intend to perform [the] representation at the time it was made" (citing *Vandeputte*, 216 N.W.2d at 147)); *Hayes v. Northwood Panelboard Co.*, 415 N.W.2d 687, 690 (Minn. Ct. App. 1987) (recognizing that misrepresentations regarding future performance can support a fraud claim where there is "affirmative evidence that the promissor had no intention to perform at the time the promise was made").

agreed to "have the Walmart POs assigned to Three Two Eight," and Sachs responded later that day that he promised to "get this set up so that [they] all ha[d] security knowing that the money from [W]almart PO's w[ould] be funded into [their] new partnership," (Shannon Decl., Exs. 20, 21); however, Sachs' email directly followed Bruce's email, where Bruce only specifically asked for "confirmation that Walmart will be wiring their payments to the joint account for the two POs," (*id.*, Ex. 21).  Thus, the record is not clear whether Sachs was promising to comply with the LeDucs' attorney's broad request or the narrower request Bruce made.  A jury could find either and, therefore, the Court finds 4Brava cannot rely on this promise for affirmative summary judgment on its fraud claim.

That leaves Sachs' promises to change the remit address with Walmart to a joint Three Two Eight account and to add Jennea to that account.  There is evidence that these promises occurred; however, there is not clear evidence that Sachs did not intend to follow through on the promises.  Sachs submitted a form to Walmart to change the remit address to the joint account, which Walmart rejected because the account did not match the vendor information on file.  Thus, it is not clear from the record that Sachs did not intend to direct Walmart to deposit into the joint account or to add Jennea to that joint account at the time that Sachs made those statements.

Because questions of material fact remain over whether Sachs promised or stated that he would switch the Walmart orders to Three Two Eight's name, and whether he did not intend to change the remit address at the time that he made that promise, the Court will deny 4Brava's motion for summary judgment on the fraud claim.

## C.    Breach of Fiduciary Duties

Next, 4Brava seeks affirmative summary judgment on its breach of fiduciary duty claim.  4Brava argues that Sachs and DSC Products Holding breached their fiduciary duties by engaging in self-dealing, theft, and misrepresentation.  "To prevail on a claim for breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary duty, breach of that duty, damages and proximate causation."  *Weiner v. Naegele*, No. 11-885, 2012 WL 2906299, at *5 (D. Minn. July 16, 2012) (citing *State Farm Fire & Cas. v. Aquila Inc.*, 718 N.W.2d 879, 887 (Minn. 2006); *Padco, Inc. v. Kinney & Lange*, 444 N.W.2d 889, 891 (Minn. Ct. App. 1989)).

4Brava argues that Sachs and DSC Products Holding owed a fiduciary duty as manager and member of Three Two Eight.  Citing no Minnesota precedent, Defendants contend that the parties never created a partnership or joint venture, and thus, no fiduciary duties arose.  Defendants argue fiduciary duties do not arise from the mere filing of articles of incorporation.  *See Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1201 (S.D.N.Y. 1996) (finding the filing of a certificate of limited partnership insufficient to show a joint venture).  Defendants also argue that where parties engage in negotiations regarding a new entity and contemplate a written agreement, but never sign it, no fiduciary duties arise.  *See Langer v. Dadabhoy*, 843 N.Y.S.2d 262, 263 (N.Y. App. Div. 2007) (rejecting a breach of fiduciary duty claim where the parties "intended to finalize their agreement in a writing," but plaintiff discontinued negotiations because "there was no mutual assent or meeting of the minds as to the proposed joint venture"); *City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1035, 1037, 1045

(N.D. Cal. 2001) (rejecting claim where "there was never any actionable agreement at all, only failed negotiations").

The first issue with Defendants' arguments is that Minnesota defines a partnership as "the association of two or more persons to carry on as co-owners a business for profit" regardless of "whether or not the persons intend to form a partnership."  Minn. Stat. § 323A.0202(a).  Defendants ignore the fact that the parties engaged in more than mere negotiation to form Three Two Eight.  Instead, the record shows the parties engaged in business under the name of their joint venture, Three Two Eight, and Sachs himself signed contracts and opened a bank account under the name Three Two Eight.

Second, the parties formed Three Two Eight as a limited liability company by filing articles of organization with the secretary of state and paying certain fees, *see* Minn. Stat. § 322B.175, on November 26, 2014.  Based on that relationship, Sachs and DSC Products Holding owed duties to act in good faith and to act in the best interests of Three Two Eight.  *See* Minn. Stat. § 322B.69 (describing a manager's responsibilities to act in good faith and "in a manner the manager reasonably believes to be in the best interests of the limited liability company"); *see also* Minn. Stat. § 322B.833, subd. 4 (providing that "all members in a closely held limited liability company owe one another [a duty] to act in an honest, fair, and reasonable manner in the operation of the limited liability company").  Therefore, contrary to Defendants' assertions, Sachs and DSC Products Holding owed fiduciary duties as managers and members of Three Two Eight.

4Brava next contends that Sachs and DSC Products Holding breached their fiduciary duties by diverting the Walmart and Menards purchase orders and proceeds to

DSC Products, while Three Two Eight provided the product and took on the expenses. "An insider transaction is presumed to be a conflict of interest and the burden is on the insider to prove that it did not breach its duties of loyalty and good faith." *Bartholomew v. Avalon Capital Grp., Inc.*, 828 F. Supp. 2d 1019, 1029 (D. Minn. 2009).   Also, "transactions involving corporations under the common control of the same officers or directors are to be regarded with skepticism by the courts and closely scrutinized." *Id.* (quoting *Swanson v. Tomlinson Lumber Mills, Inc.*, 239 N.W.2d 216, 221 (Minn. 1976)). Partners "may not usurp or divert for their own benefit business opportunities that properly belong to the partnership." *Triple Five of Minn., Inc. v. Simon*, 404 F.3d 1088, 1095 (8th Cir. 2005).

To determine whether a claim for usurpation of a corporate opportunity arises, the Court considers whether "the business opportunity is of sufficient importance and is so closely related to the existing or prospective activity of the corporation as to warrant judicial sanctions against its personal acquisition by a managing officer or director of the corporation." *Nygaard v. Nygaard*, No. 13-276, 2014 WL 349647, at *3 (Minn. Ct. App. Feb. 3, 2014) (quoting *Miller*, 222 N.W.2d at 81).   If so, "the burden shifts to the acquiring officer to show that the acquisition did not violate the fiduciary duties of loyalty, good faith, and fair dealing toward the corporation." *Id.*

Defendants contend that 4Brava has not shown a usurpation of corporate opportunity.   But the record clearly shows the initial and primary purpose of Three Two Eight was to complete the Walmart orders and supply tumblers to Walmart.   Thus, the Walmart orders are conclusively related to the existing and prospective activity of Three

Two Eight, and Defendants usurped that opportunity by funneling the proceeds of that order into DSC Products rather than Three Two Eight.  And while the Menards order was not the initial purpose of Three Two Eight, Defendants involved Bruce, and thus Three Two Eight, in the initial talks with Menards.[9]

Defendants argue that the parties never agreed not to compete with Three Two Eight and that DSC Products and Signature both remained free to sell tumblers to other businesses and individuals.  This is likely true, but Defendants could still not use Three Two Eight's resources and pretend to act on behalf of Three Two Eight, while siphoning the revenue from those deals.  Defendants' argument instead goes to the amount of damages 4Brava would be entitled to based on the breach of fiduciary duty.

Defendants also assert that 4Brava cannot recover based on the sales to Walmart because its right to recover for those sales is based on a breach of contract claim.  But, 4Brava does not have to rely on a contract or agreement to show Three Two Eight's entitlement to revenue from the deal that Three Two Eight was formed to complete and was billed for completing.  Also, the cases Defendants rely on stand for a different

---

[9] The other cases relied on by Defendants are distinguishable.  In *Rensch ex rel. Nominal Defendant N. Oil & Gas, Inc. v. Reger*, the court found that "the mere existence of a competitor is not legally wrongful," and that "a usurpation claim requires some **wrongful** conduct by the alleged usurper."  No. 10-3679, 2012 WL 1593237, at *4-5 (D. Minn. May 7, 2012).  The plaintiff had alleged only the creation of "entities that at most could potentially usurp an opportunity," *id.* at *4; whereas, in this case, 4Brava showed that Defendants in fact funneled profits from an opportunity belonging to Three Two Eight, while leaving Three Two Eight, 4Brava, and Signature with the expenses.  *See also Luigino's, Inc. v. Peterson*, No. 00-1246, 2002 WL 122389, at *10 (D. Minn. Jan. 28, 2002), *aff'd*, 317 F.3d 909 (8th Cir. 2003) (finding that the fact that "a director of one company [was] also a director of another company with a competing interest" did not necessarily establish a breach of fiduciary duty claim, even though it could "rightly cause a court to look more closely at the director's conduct for evidence of breach").

proposition entirely, suggesting only that a party does not violate its duty of good faith by enforcing its rights under contract. *See Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 918 (8th Cir. 2013) ("A party to a contract 'does not act in bad faith by asserting or enforcing its legal and contractual rights.'" (quoting *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998))); *Fagen, Inc. v. Exergy Dev. Grp. of Idaho, L.L.C.*, No. 12-2703, 2016 WL 5660418, at *9 (D. Minn. Sept. 29, 2016) (finding that a party could not establish a breach of duty "merely because it enforced" a contract). Defendants have no viable argument that they were enforcing a contract or agreement between the parties by keeping the proceeds of the Walmart orders.[10]

For these reasons, the Court finds that Sachs and DSC Products Holding breached their fiduciary duties by taking the revenue from the Walmart orders. Accordingly, the Court will grant 4Brava's motion for summary judgment on this claim.

The proper remedy and amount of damages present additional challenges. But, the Court finds 4Brava established its entitlement to one particular remedy as a matter of law. Minnesota law provides for dissolution of an LLC in an action initiated by a member if it

---

[10] Defendants also reference *Carlson v. SALA Architects, Inc.* for the proposition that "[a] fiduciary relationship is characterized by a 'fiduciary' who enjoys a superior position in terms of knowledge and authority and in whom the other party places a high level of trust and confidence," which Defendants argue is not present here. 732 N.W.2d 324, 330 (Minn. Ct. App. 2007). However, *Carlson* involved determining whether an architect owed a fiduciary duty to a client. Here, the Court need not find a common law fiduciary relationship between the parties. The fiduciary duties are established by statute based on the partnership or corporate relationship, as discussed above.

is established that the members are unable to break a deadlock, someone in control of the LLC "acted fraudulently, illegally, or in a manner unfairly prejudicial toward one or more members," or the LLC "assets are being misapplied or wasted," among other things. Minn. Stat. § 322B.833, subd. 1(2)(i)-(ii), (iv).  Because the Court finds Sachs and DSC Products Holding breached their fiduciary duties, the Court will grant 4Brava's request for dissolution of Three Two Eight as set forth in Count VII of its Complaint.  (*See* Notice of Removal, Ex. 1 ¶¶ 118-23, Case No. 15-2744).  Accordingly, the Court will order dissolution and direct 4Brava to wind-up Three Two Eight in accordance with its unchallenged expert report.  (*See* Shannon Decl., Ex. 57).  Pursuant to this dissolution, 4Brava will receive a portion of the Walmart revenue, and Signature will be repaid for its contribution to Three Two Eight's debts.

4Brava also requests additional monetary damages, including Defendants' sales revenue and assets earned pursuant to their breach of fiduciary duties.  *See Triple Five of Minn.*, 404 F.3d at 1099 ("If the partnership opportunity is usurped, 'the opportunity and any property or profit acquired becomes subject to a constructive trust for the benefit' of the partnership." (quoting *Miller*, 222 N.W.2d at 78)).  However, the Court finds that 4Brava's submissions do not conclusively establish a precise amount for these types of damages, and thus, the Court will not award any such damages at this time.  Any such damages must be proven at trial or by additional briefing.[11]

---

[11] 4Brava also requests attorneys' fees under Minn. Stat. § 322B.833, subd. 7, which the Court will consider at a later date, following judgment and a motion with proper support, *see* Fed. R. Civ. P. 54(d).

### D.      Unlawful Distributions

4Brava moves for summary judgment for unlawful distributions pursuant to Minn. Stat. § 322B.54.   Under that provision, a distribution is only permitted if "the limited liability company [would] be able to pay its debts in the ordinary course of business after making the distribution."  *Id.* § 322B.54, subds. 1-2.  Minnesota law provides for liability against "[a] member who receives a distribution made in violation of section 322B.54." *Id.* § 322B.55, subd. 1.  However, the statute defines "distribution" as "a direct or indirect transfer of money or other property . . . by a limited liability company to any of its members."  *Id.* § 322B.03, subd. 17.  Thus, the unlawful distribution provision does not, on its face, apply where the LLC is not involved in the transfer.  Here, 4Brava alleges Sachs diverted money away from Three Two Eight – not that Three Two Eight directed money to any members.   Accordingly, the Court will deny 4Brava's motion on its unlawful distribution claims.  The wrongful conduct here is more properly addressed by its other claims.

### E.      Civil Theft

4Brava argues for summary judgment on its civil theft claim under Minn. Stat. § 604.14, subd. 1, which states that "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages."  A criminal theft claim is not a prerequisite to liability, but "courts rely on the criminal theft statute to determine whether a defendant's conduct amounted to theft."

*Damon*, 937 F. Supp. 2d at 1076.   4Brava points to three subsections in Minn. Stat. § 609.52, the criminal theft statute, to support its civil theft claim.

First, 4Brava relies on section 609.52, subdivision 16, which provides that a person is liable for theft if he or she "with intent to defraud, authorizes or causes a corporation to make a distribution in violation of section 302A.551, or any other state law in conformity with it."   As discussed above, Defendants' retention of revenue that should have gone into Three Two Eight is not clearly a "distribution" under the statute's definition, and thus, 4Brava cannot rely on subdivision 16 as a basis for affirmative summary judgment.

Second, 4Brava argues for the application of section 609.52, subdivision 13, which states that theft includes "obtain[ing] the services of another with the intention of receiving those services without making the agreed or reasonably expected payment of money or other consideration."   4Brava contends that Defendants violated this subdivision when they used Three Two Eight's resources, intending to keep the proceeds, without sharing the proceeds with Three Two Eight (and 4Brava as half owner).   But it is not clear that Three Two Eight's resources qualify as "services" under subdivision 13. *See* Minn. Stat. § 609.52, subd. 1(9) ("'Services' include but are not limited to labor, professional services, transportation services, electronic computer services, the supplying of hotel accommodations, restaurant services, entertainment services, advertising services, telecommunication services, and the supplying of equipment for use including rental of personal property or equipment.").   And neither party provides any case law interpreting this subdivision.   Additionally, the plain language of this subdivision requires

intent not to pay or perform at the time the services were obtained, and questions of fact remain regarding Defendants' intent at the time Defendants used Three Two Eight's resources.

Finally, 4Brava argues for the application of section 609.52, subdivision 2(3), under which a person commits theft when he or she "obtains for the actor or another the possession, custody, or title to property of or performance of services by a third person by intentionally deceiving the third person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." But as discussed above, genuine issues of material fact remain over whether Sachs made a false statement regarding the Walmart funds, and therefore, summary judgment based on subdivision 2(3) is not appropriate.

For these reasons, the Court finds that 4Brava has not established its civil theft claim as a matter of law and will deny its motion for summary judgment on this claim.

### F.    Unjust Enrichment

4Brava contends that DSC Products was unjustly enriched by retaining the Walmart revenue, which belonged to Three Two Eight, and using that revenue to replicate Signature's injection molds and compete with the partnership. "To establish a claim for unjust enrichment under Minnesota law, the plaintiff must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." *Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1140-41 (D. Minn. 2011) (quoting *Schaaf v. Residential*

*Funding Corp.*, 517 F.3d 544, 553-54 (8th Cir. 2008)).  However, an unjust enrichment

claim fails "where there is an adequate remedy at law."  *ServiceMaster of St. Cloud v.*

*GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996).  Because the Court will grant

4Brava's motion for summary judgment on its breach of fiduciary claim and order

windup of Three Two Eight, under which 4Brava will receive its share of the Walmart

profits, the Court will deny 4Brava's motion on its unjust enrichment claim.


## IV.  SIGNATURE'S MOTION FOR AFFIRMATIVE SUMMARY JUDGMENT
(Case No. 15-2743, Docket No. 112)

Signature also seeks affirmative summary judgment against Defendants on several

claims:  (1) fraud, (2) tortious interference with contract, (3) unjust enrichment, and (4)

promissory estoppel.


### A.    Fraud

Signature asks for affirmative summary judgment on its fraud claim.  Signature

relies on many of the same arguments the Court rejected above with regard to 4Brava's

fraud claim.  In addition, Signature raises the following alleged fraudulent omissions:

(1) Sachs' belief that Walmart would not do business with a new organization like Three

Two Eight; (2) Sachs' failure to attempt to transfer the Walmart account into Three Two

Eight's name; and (3) Sachs' continued sales to Walmart and payments from Walmart

with DSC Products as vendor.

To recover based on a misrepresentation by omission, a plaintiff must show:

(1) the defendant "omitted a past or present material fact . . . that [the defendant] [was]

under a duty to disclose"; (2) the defendant "intended for [the plaintiff] to rely on the omission"; (3) the plaintiff "did rely on the omission"; and (4) the plaintiff "suffered pecuniary damages as a result of [t]his reliance." *Williams v. Heins, Mills & Olson, PLC*, No. 09-1757, 2010 WL 3305017, at *3 (Minn. Ct. App. Aug. 24, 2010); *see also Sjogren*, 244 N.W.2d at 650 (finding that an omission may be the basis for a fraud claim where there is "suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him"). In *Sjogren*, the Minnesota Supreme Court found that a party can have a viable claim based on an omission where partial disclosure would lead to a false impression, where one party has special knowledge of material facts, and where there is a fiduciary relationship. 244 N.W.2d at 650.

Signature may have a viable fraud-by-omission claim based on Sachs' partial truths, leading the LeDucs to believe that Sachs would transfer the Walmart orders to Three Two Eight's name, or based on Sachs' fiduciary duty. However, the Court finds that Signature has not established such a claim as a matter of law – questions of material fact remain, and a jury would not necessarily find in Signature's favor. As discussed above, the parties disagree over Sachs' particular statements and promises. It is not clear if Sachs represented or gave the impression that he would switch the vendor name to Three Two Eight, or just that he would change the account information so that Walmart would deposit the revenue directly into Three Two Eight's account. For these reasons and the reasons articulated in Part III.B, the Court will deny Signature's summary judgment motion on this claim.

**B.      Tortious Interference with Contract**

Signature argues Defendants tortiously interfered with Signature's agreement with Three Two Eight; specifically the agreement that Three Two Eight could use Signature's account with Aroplax, provided that Three Two Eight timely paid its bills.  A claim for tortious interference with contract under Minnesota law requires that:  "(1) a contract existed; (2) the alleged wrongdoer . . . had knowledge of the contract; (3) the alleged wrongdoer intentionally interfered with the contract; (4) the alleged wrongdoer's actions were not justified; and (5) damages were sustained as a result."  *Guinness Import Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607, 613 (8th Cir. 1998).  Signature argues that it agreed to allow Three Two Eight to use Signature's account, on the condition that Sachs assure Three Two Eight had access to funds.  However, the record does not show conclusively that Signature made this a condition of an actual contract with Three Two Eight.  The Court finds questions of material fact remain over the nature of any contract between Signature and Three Two Eight and whether Defendants tortiously interfered with such a contract, and therefore, the Court will deny Signature's motion on this claim.

**C.      Unjust Enrichment**

Signature argues that Defendants were unjustly enriched by refusing to pay invoices and that Defendants tricked Signature into allowing Three Two Eight to use Signature's account with Aroplax on deals for which Defendants took the proceeds.  "To establish a claim for unjust enrichment under Minnesota law, the plaintiff must show that the defendant has knowingly received or obtained something of value for which the

defendant in equity and good conscience should pay." *Cenveo Corp.*, 784 F. Supp. 2d at 1140-41 (quoting *Schaaf*, 517 F.3d at 553-54).  However, an unjust enrichment claim fails "where there is an adequate remedy at law."  *ServiceMaster of St. Cloud*, 544 N.W.2d at 305.

Defendants argue that Signature did not confer a benefit on Defendants because Defendants merely retained the benefits of their own sales to Walmart.  The only evidence Defendants cite is Sachs' declaration stating Sachs "funded the cost of the product [he] sold to [Walmart]."  (Sachs. Decl. ¶ 16.)  Sachs' declaration conflicts with Sachs' testimony that Signature or 4Brava paid Aroplax $630,000.00 to cover expenses related to the Walmart orders.  However, based on the discussion above, Signature will receive reimbursement for the benefit it conferred pursuant to the Court-ordered windup of Three Two Eight.  Thus, a remedy is available for the alleged unjust enrichment and the Court will deny Signature's motion on its unjust enrichment claim.

### D.    Promissory Estoppel

Signature finally moves for affirmative summary judgment on its promissory estoppel claim.  A promissory estoppel claim requires a "clear and definite" promise, "intended to induce reliance," resulting in reliance, and that the Court must enforce the promise "to prevent an injustice."  *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992).  Signature relies on Defendants' alleged promises to add Three Two Eight as a vendor, to pay Three Two Eight all of the funds received from the Walmart orders, and to ensure Jennea was a signor.  Signature contends that Defendants made these

promises to induce Signature to complete the Walmart orders.  Defendants argue that this claim fails because it relies on the same promises as the fraud claim, which are not clear and definite.  As discussed above, the facts regarding these promises are not entirely clear.  Because the Court finds insufficient evidence of a clear and definite promise that justice requires to be enforced, the Court will deny Signature's motion.

## V.     SIGNATURE'S MOTION TO DISMISS COUNTERCLAIMS AND CROSSCLAIMS (Case No. 15-2743, Docket No. 100)

Signature and the LeDucs move to dismiss counterclaims and crossclaims that were the subject of a settlement agreement with Defendants.  West Bend Mutual Insurance Company ("West Bend") insured Signature and reached a settlement agreement with Defendants regarding the counterclaims covered by insurance.  Defendants signed a release under which they received $90,000.00 from West Bend, in exchange for the release of

> all liability, claims, and claims for damages of any kind DSC [Products] asserted or could have asserted in regard to the following claims: (1) Counts VII & VIII of the Counterclaims; (2) Counts I & V of the Third-Party Claims; and (3) Any and all cross-claims asserted or those that could have been asserted in regard to claims identified in Nos. (1) and (2) above, and any claims that are or arguably may be covered by the aforementioned Policies of insurance, or any other insurance afforded to LeDuc by West Bend.

(Aff. of Timothy J. O'Connor, Ex. 1 ("Release") at 3, Aug. 15, 2016, Docket No. 104.) The release further stated that Defendants did not release the claims not covered by insurance and specifically identified those claims by count numbers.[12]   (*Id.*)

4Brava refused to agree to West Bend's and Defendants' proposed stipulation of dismissal. 4Brava argues Defendants released all claims for damages, including under the unsettled claims, because all of Defendants' claims seek the same damages. 4Brava asks the Court to grant the motion to dismiss, but limit Defendants to seeking injunctive or other, non-damages claims for relief, or deny the motion for voluntary dismissal because it would prejudice 4Brava. The Court finds no evidence the parties intended to release all claims for damages, the plain language does not support such a reading, and 4Brava does not provide any case law supporting this interpretation.

4Brava asserts it would suffer prejudice in the form of a conflict of interest and possible breach of legal duties between members and managers of both 4Brava and Signature because it would be forced "to prove that the damages at issue were the result of the other Counter or Third Party Defendants' conduct at issue in the settled claims." (4Brava Mem. of Law in Response to Signature and the LeDucs' Mot. to Dismiss at 9-10, 12-13, Sept. 6, 2016, Docket No. 134.) However, 4Brava does not provide any case law in support, and the Court does not find this argument persuasive.

---

[12] The release stated: "Specifically, the following claims are not released: (a) Counts I, II, III, IV, V, VI, IX, X, XI and XII of the Counterclaims; and (b) Counts II, III, IV, VI, VII of the Third-Party Complaint." (Release at 3.)

While the Court recognizes 4Brava's standing to object to the partial settlement, *see Alumax Mill Prods., Inc. v. Congress Fin. Corp.*, 912 F.2d 996, 1002 (8th Cir. 1990) (quoting *Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987)), the Court finds that to the extent any remaining claims are covered by insurance – and thus Plaintiffs could have split the damages with the insurance company – they are barred by the release. And to the extent the remaining claims are based on the same facts and injury as the settled claims, the total reward should be reduced by the $90,000.00 to prevent double recovery. Thus, allowing the settlement would not result in any prejudice to 4Brava. Defendants could have solely brought these claims, not covered by insurance, and 4Brava would be in the same position that it is in now. Thus, the Court will grant the motion to dismiss the settled claims.

## VI. SIGNATURE'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS (Case No. 15-2743, Docket No. 105)

Signature seeks summary judgment on all of DSC Products' counterclaims: breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation, conversion and civil theft, and promissory estoppel. The Court discusses each claim, in turn, below.

### A. Breach of Fiduciary Duty

Signature argues DSC Products' counterclaim for breach of fiduciary duty fails because Defendants have not shown that Signature owed them a fiduciary duty. DSC Products alleged that Signature and DSC Products entered a joint venture to "purchase

and jointly own injection molds" and that Signature breached its fiduciary duty by claiming full ownership over the molds.  (Answer, Affirmative Defenses & Countercls. ("Answer & Countercls.") at 23-25, June 22, 2015, Docket No. 6.)  However, DSC Products points only to its allegations to support its claim.

DSC Products argues a fiduciary duty exists between DSC Products and Signature because they were parties to a joint venture.  DSC Products posits that Signature is estopped from arguing no fiduciary duty existed because its counsel previously argued on behalf of 4Brava that there is no difference under Minnesota law between a partnership and a joint venture.

As discussed above, a joint venture or partnership may be enough to establish some fiduciary duties among the parties.  *See Lipinski v. Lipinski*, 35 N.W.2d 708, 712 (Minn. 1949) (stating that partners and joint venturers owe each other a fiduciary duty); *Soderberg & Vail, LLC v. Meshbesher & Spence, Ltd.*, Nos. 15-88, 15-358, 2016 WL 22251, at *4 (Minn. Ct. App. 2016) ("A fiduciary relationship exists between partners in a joint venture.").  However, DSC Products ignores that the partnership and LLC involved 4Brava, not Signature.  And unlike with regard to Sachs and his corporate entities, DSC Products submits no evidence that 4Brava, Signature, and the LeDucs operated as alter egos of each other and abused the corporate form.  Thus, while 4Brava owed fiduciary duties to Three Two Eight, Sachs, and DSC Products Holding, there is no evidence suggesting that Signature – a third party, solely involved with the molds – owed such a duty.  Because DSC Products has not put forward sufficient evidence to establish a

fact question over whether Signature owed DSC Products a fiduciary duty, the Court will grant Signature's motion on this counterclaim.

### B.      Breach of Contract

Signature asserts that DSC Products' breach of contract counterclaim is barred by the statute of frauds. "Minnesota's statute of frauds requires a signed writing sufficient to indicate that a contract has been made" for the sale of goods exceeding $500.00. *Simplex Supplies, Inc. v. Abhe & Svoboda, Inc.*, 586 N.W.2d 797, 800 (Minn. Ct. App. 1998); *see also* Minn. Stat. § 336.2-201(1).

In response, DSC Products contends the breach of contract claim is based on a breach of the joint venture agreement, which it argues is not actually an agreement for sale of goods.  (*See* Answer & Countercls. at 25-26.)  DSC Products broadly asserts that the statute of frauds does not apply to this joint venture agreement; but the cases DSC Products relies upon only discuss "joint venture agreements wherein the parties undertake to purchase and resell land for joint profit." *Peterson v. Petersen*, No. 88-1875, 1989 WL 38394, at *2 (Minn. Ct. App. Apr. 25, 1989); *see also Anderson v. Prop. Developers, Inc.*, 555 F.2d 648, 654 (8th Cir. 1977).  Thus, it is not clear that the holding in *Peterson* and *Anderson* extends to cases involving joint venture agreements relating to something other than the purchase and resale of land.  Moreover, even if such an exception exists, it does not save DSC Products' claim because no evidence in the record suggests that DSC Products entered into a joint venture agreement with Signature – even Sachs admitted that the joint venture involved 4Brava. Thus, a contract between Signature and DSC

Products regarding the molds would have solely been an oral contract for the purchase of the molds, and therefore, barred by the statute of frauds.  Accordingly, the Court will grant Signature's motion on DSC Products' breach of contract counterclaim.

### C.    Implied Covenant of Good Faith and Fair Dealing

Signature posits that DSC Products' counterclaim for breach of the implied covenant of good faith and fair dealing also fails because there is no contract.  "[A] cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim."  *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2012) (quoting *Orthomet, Inc. v. A.B. Med., Inc.*, 990 F.2d 387, 392 (8th Cir. 1993)).  Because the Court will dismiss DSC Products' breach of contract counterclaim, the Court will also grant summary judgment on DSC Products' implied covenant of good faith and fair dealing claim.  *See Transocean Grp. Holdings Pty Ltd. v. S.D. Soybean Processors, LLC*, 663 F. Supp. 2d 731, 742 (D. Minn. 2009).

### D.    Intentional Misrepresentation

Signature argues that DSC Products' fourth counterclaim for intentional misrepresentation must be dismissed because DSC Products failed to allege the claim with particularity.  A claim for intentional or fraudulent misrepresentation requires that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

*Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007) (quoting

*Hagen*, 392 N.W.2d at 532).   Additionally, because an intentional misrepresentation

claim is based on fraud, DSC Products must plead it with particularity.   Fed. R. Civ. P.

9(b); *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010).   To satisfy the

particularity standard, "the complaint must allege 'such matters as the time, place, and

contents of false representations, as well as the identity of the person making the

misrepresentation and what was obtained or given up thereby.'"   *Drobnak v. Andersen*

*Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (quoting *Schaller Tel. Co. v. Golden Sky Sys.,*

*Inc.*, 298 F.3d 736, 746 (8th Cir. 2002)); *see also Murr Plumbing, Inc. v. Scherer Bros.*

*Fin. Servs. Co.*, 48 F.3d 1066, 1069-70 (8th Cir. 1995) (finding dismissal for lack of

particularity proper on summary judgment).

In response, DSC Products points to general assertions in the counterclaims and in

Sachs' declaration that Bruce, on behalf of Signature, represented that Signature and DSC

Products would own the molds jointly.   (Answer & Countercls. at 28; Sachs Decl. ¶¶ 7,

17.)   But, looking at the record as a whole, there are significant reasons to doubt that such

a statement occurred.   First, Sachs cannot provide a particular date for the promise; he

only states that it occurred sometime between April 2014 and September 2014.   Second,

there is no evidence of such a promise in the numerous emails between the parties.

Third, Sachs has been inconsistent regarding whether he owned the molds solely or

whether they were jointly owned, which suggests that the ownership arrangement was not

clear.   Sachs admitted that the parties never discussed Sachs keeping the molds at the end

of the partnership, so it is not clear that the parties ever agreed, or that Signature

promised, that Sachs would own the molds.  Finally, Sachs found out that Signature intended to assert sole ownership over the molds in February 2015, and his reaction did not suggest that it was contrary to prior specific promises.

But even more importantly, these vague allegations alone are insufficient to withstand summary judgment.  "When the moving party has carried its burden under Rule 56 . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Because DSC Products still fails to identify a misrepresentation with any particularity or support such a misrepresentation with any evidence, the Court will grant Signature's motion on DSC Products' intentional misrepresentation counterclaim.

### E.    Conversion and Civil Theft

Signature asserts that it is entitled to summary judgment on DSC Products' counterclaims for conversion and for civil theft because they depend on a breach of contract.  "A plaintiff seeking breach of contract damages is limited to 'damages flowing from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort.'"  *McNeil & Assocs., Inc. v. ITT Life Ins. Corp.*, 446 N.W.2d 181, 185 (Minn. Ct. App. 1989) (quoting *Wild v. Rarig*, 234 N.W.2d 775, 789 (Minn. 1975)).[13]

---

[13] Signature also seeks dismissal of the civil theft claim because there is no evidence that it used improper methods to initially obtain the molds.  *See City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 979 F. Supp. 2d 981, 996 (D. Minn. 2014) (noting civil theft "typically involve[s] an element of fraud at the time a transaction takes place").

If DSC Products had an ownership interest in the molds, those rights arose from the creation of an oral contract.  Thus, DSC Products' remedy would be in a breach of contract action.  DSC Products disputes this conclusion, but provides no case law for the idea that it can recover via conversion and civil theft where its property interest is based solely on a contract.  DSC Products relies on the invoice for the molds, which shows Sachs' contribution to the molds.  (Sachs Decl., Ex. A.)  However, DSC Products ignores that the invoice only shows Sachs contributed half of the cost of the molds, and does not necessarily prove who holds ownership interests in the molds, particularly in light of other record evidence regarding the molds.

DSC Products contends that it can plead conversion and civil theft claims in the alternative to the breach of contract claim; but, those claims do not add anything to the breach of contract claim.  If the breach of contract claim fails, then DSC Products does not have a right to the property and no theft or conversion has occurred.  Because even construing the facts in DSC Products' favor, any interest it holds in the molds are based on an oral contract, "the gravamen of the complaint is . . . breach of contract" and DSC Products cannot bring a tort claim without an independent tort.  *McNeill & Assocs.*, 446 N.W.2d at 185.  The Court will, therefore, grant Signature's motion on DSC Products' conversion and civil theft counterclaims.

## F.     Promissory Estoppel

Signature argues that DSC Products' counterclaim for promissory estoppel fails because DSC Products failed to provide evidence of a "clear and definite" promise,

"intended to induce reliance," resulting in reliance, and that the Court must enforce the promise "to prevent an injustice."  *See Cohen*, 479 N.W.2d at 391.

DSC Products again relies on its allegation that Signature, through Bruce, promised joint ownership of the molds.  As discussed above with regard to DSC Products' fraud claim, Signature points to significant evidence suggesting such a promise never occurred and that same evidence suggests Signature never made a "clear and definite" promise.  DSC Products does not point to any contemporaneous records for this promise.  Additionally, Sachs' deposition testimony suggests that he conflates the concept of investment in or payment for an item with ownership.  Finally, Sachs provided inconsistent statements regarding whether the molds would be jointly or solely owned, suggesting any promises Signature made regarding ownership of the molds were not clear to Sachs at the time.

To confront this evidence, DSC Products relies solely on Sachs' declaration and allegations made in the Answer & Counterclaims.  Sachs declaration provides that "[t]he LeDucs and Signature clearly and definitely promised me that DSC [Products] would jointly own the molds, and split all costs 50/50."  (Sachs Decl. ¶ 10.)  Sachs also described his payments on the molds and stated that he "paid for the molds, and owned the molds."  (*Id.* ¶ 11.)  DSC Products contends that Sachs' statement that such a promise occurred establishes a fact issue, and DSC Products does not respond to Signature's other arguments.

While Signature bears the burden as a moving party, DSC Products "must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  The record before the Court suggests that, at most, there was a misunderstanding regarding the ownership of the molds, and based on that evidence, a jury could not find that Signature specifically promised joint or sole ownership to Sachs and DSC Products.  Accordingly, the Court will grant Signature's motion with regard to DSC Products' promissory estoppel counterclaim.

### G.    Other Counterclaims

In response to Signature's motion, DSC Products agreed to dismiss with prejudice the ninth, eleventh, and twelfth counterclaims, in which it alleged unfair competition, intentional interference, and declaratory relief.  (Defs.' Mem. in Opp'n to Counterdef. Signature's Mot. for Summ. J. at 14, Oct. 19, 2016, Docket No. 141.)  And, therefore, the Court will grant Signature's motion with regard to those claims.

## VII.   MOTIONS FOR SUMMARY JUDGMENT ON THE CROSSCLAIMS AND THIRD-PARTY COMPLAINT (Case No. 15-2743, Docket Nos. 108, 121)

The third-party defendants, including 4Brava and the LeDucs, also filed motions for summary judgment on the remaining crossclaims and third-party complaint claims. Following DSC Products' release of Counts I and V, as discussed above, the remaining claims subject to this motion are Counts II, III, IV, VI, and VII, which are for fraud, conversion, conspiracy to commit civil theft, promissory estoppel, and intentional interference and conspiracy to interfere with economic advantage and with contract.

The Court will grant the LeDucs' and 4Brava's motions with regard to DSC Products' fraud claim because it relies on the same general allegations as the intentional

misrepresentation and promissory estoppel claim against Signature.  As discussed above, in light of the record before the Court, those allegations are insufficient to support a fraud claim at the summary judgment stage.  The Court will, therefore, grant the motions and dismiss DSC Products' fraud claim against the LeDucs and 4Brava.

The Court will also grant the LeDucs' and 4Brava's motions with regard to DSC Products' conversion, civil theft, and promissory estoppel claims for the same reasons the Court will grant summary judgment on those claims as to Signature.

Finally, DSC Products did not respond to the LeDucs' arguments regarding its intentional interference with economic advantage and contract claim, and DSC Products admitted that it no longer sought to pursue the claim at the oral argument.  The Court will, therefore, grant summary judgment on that claim as well.[14]

This case will be placed on the Court's next available trial calendar.

---

[14] Alternatively, the Court would be inclined to grant summary judgment on this claim based on the fact that DSC Products failed to allege any breach of contract with Walmart, and thus, DSC Products did not allege an element of an intentional interference with contract claim. *See Kallock v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998) (including "intentional procurement of [a contract's] breach" as an element of a tortious interference claim); *see also Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1043 (D. Minn. 2013) ("The law is clear in Minnesota, however, that a claim for tortious interference with contractual relations 'fails as a matter of law' if it does not allege that the defendant 'intentionally procured a breach' of the contract." (quoting *E-Shops Corp. v. U.S. Bank, Nat'l Ass'n*, 678 F.3d 659, 665 (8th Cir. 2012)).

# ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiffs' Objections [Case No. 15-2743, Docket No. 138; Case No. 15-2744, Docket No. 119] are **SUSTAINED**, and the Magistrate Judge's September 30 Orders [Case No. 15-2743, Docket No. 137; Case No. 15-2744, Docket No. 118] are **REVERSED**.   Accordingly, Defendants' Motions for Extension of Time to Complete Discovery [Case No. 15-2743, Docket No. 124; Case No. 15-2744, Docket No. 108] are **DENIED**.

2.      4Brava's Motion for Affirmative Summary Judgment [Case No. 15-2744, Docket No. 102] is **GRANTED in part** and **DENIED in part** as follows:

   a.      The motion is **GRANTED** with regard to 4Brava's breach of fiduciary duty claim and 4Brava's request for dissolution of Three Two Eight.

   b.      The motion is **DENIED** with regard to 4Brava's fraud, unlawful distributions, civil theft, and unjust enrichment claims.

   c.      Defendants Daniel Sachs, DSC Products Holding, and DSC Products are jointly and severally liable as alter egos.

   d.      Within two weeks of this Order, Defendants shall relinquish funds necessary to reimburse 4Brava and Signature for the contributions to Three Two Eight, as described above.

e.      Three Two Eight, LLC is hereby dissolved.  4Brava shall wind up the company's affairs, issuing payment to its remaining creditor(s) and distributing any additional funds pursuant to Minn. Stat. Ch. 322B.

f.      Within three months of this Order, 4Brava shall execute and file Three Two Eight termination papers with the Minnesota Secretary of State.

3.      Signature's Motion for Affirmative Summary Judgment [Case No. 15-2743, Docket No. 112] is **DENIED.**

4.      Signature's Motion to Dismiss Counterclaims/Crossclaims [Case No. 15-2743, Docket No. 100] is **GRANTED**.  Counts VII & VIII of the Counterclaims and Counts I & V of the Third Party Complaint are **DISMISSED with prejudice**.

5.      Signature's Motion for Summary Judgment on Counterclaims [Case No. 15-2743, Docket No. 105] is **GRANTED**.  DSC Products' Counterclaims are **DISMISSED with prejudice.**

6.      The LeDucs' Motion for Summary Judgment on the Crossclaims and Third Party Complaint [Case No. 15-2743, Docket No. 108] is **GRANTED**, and 4Brava's Motion for Summary Judgment on the Crossclaims and Third Party Complaint [Case No. 15-2743, Docket No. 121] is **GRANTED**.  DSC Products' Crossclaims and Third Party Complaint claims are **DISMISSED with prejudice.**

DATED:  March 30, 2017                          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                                JOHN R. TUNHEIM
                                                               Chief Judge
                                                      United States District Court